713 A.2d 1019

ELEANOR BAIRD, PLAINTIFF–RESPONDENT, AND JOHN BAIRD, HER HUSBAND, PLAINTIFF, v. AMERICAN MEDICAL OPTICS, FREDERIC NEWMAN, M.D. AND VALLEY HOSPITAL, DEFENDANTS–APPELLANTS, AND XYZ COMPANIES #1 THROUGH #5 AND JOHN DOES #1 THROUGH #5, DEFENDANTS.

Argued February 18, 1998—Decided July 15, 1998.

*William A. Feldman* argued the cause for appellant American Medical Optics (*Feldman & Fiorello*, attorneys; *Mr. Feldman* and *Melissa Feldman Michalsky*, on the briefs).

*Melvin Greenberg* argued the cause for appellant Frederic Newman, M.D. (*Greenberg, Dauber and Epstein*, attorneys).

*Daniel B. Frier* argued the cause for appellant Valley Hospital (*Giblin & Combs*, attorneys).

*Richard Galex* argued the cause for respondent (*Galex, Tortoreti & Tomes*, attorneys).

POLLOCK, J.

This appeal presents two issues. The first is whether the statute of limitations, *N.J.S.A.* 2A:14–2, bars a patient's claim for lack of informed consent against an ophthalmologist who implanted an intraocular lens in the patient's eye, the hospital at which the implantation took place, and the manufacturer of the intraocular lens. The second issue is whether federal law preempts the patient's state-law claims against the manufacturer of the intraocular lens, American Medical Optics ("AMO").

In November 1983, defendant, Dr. Frederick Newman, performed cataract surgery on plaintiff, Eleanor Baird, and implanted an intraocular lens in her left eye. The Food and Drug Administration ("FDA") had approved the lens pursuant to an Investigational Device Exemption, in which AMO, in association with Valley Hospital and Dr. Newman, was conducting a clinical investigation of the lens.

After her surgery, Baird experienced multiple complications and underwent further treatment, including additional surgery. On

February 6, 1992, Baird sued Dr. Newman, AMO, and Valley Hospital.

The Law Division. granted summary judgment for all defendants. The Appellate Division reversed and remanded the matter to the Law Division. We granted certification. 151 *N.J.* 467, 700 *A.*2d 879 (1997). We modify the judgment of the Appellate Division and remand the matter to the Law Division.

## I.

Because the matter arises on defendant's motion for summary judgment, we assume the truth of plaintiff's version of the facts and give plaintiff the benefit of all inferences that those facts support. *Brill v. Guardian Life Ins. Co. of America*, 142 *N.J.* 520, 666 *A.*2d 146 (1995); *Judson v. Peoples Bank & Trust Co.*, 17 *N.J.* 67, 110 *A.*2d 24 (1954).

In 1983, Baird, who was sixty-one years old, experienced blurred vision in her left eye. On September 23, 1983, she consulted Dr. Newman, an ophthalmologist. After an examination, Dr. Newman informed Baird that she had a posterior subcapsular cataract that needed surgical removal and replacement with an implant. On the same day, Baird signed a four-page consent form.

On November 8, 1983, Dr. Newman performed the cataract removal at Valley Hospital. Dr. Newman inserted American Medical Optics ACPC–55 intraocular lens into Baird's left eye.

The 1976 Medical Device Amendments ("MDA" or "Act"), 21 *U.S.C.* §§ 360c to 360k, 379, 379a, to the Food, Drug and Cosmetic Act ("FDCA"), 21 *U.S.C.* §§ 301 to 395, authorizes the FDA to regulate the use of intraocular lenses ("IOLs"). At the time of Baird's surgery, the FDA had not approved AMO's IOL for general marketing to the public under the Pre–Market Approval ("PMA") application process. 21 *U.S.C.* § 360e. Instead, the FDA had granted AMO an Investigational Device Exemption ("IDE") for its IOL.

An IDE permits a manufacturer to conduct a clinical investigation and exempts the manufacturer from certain MDA requirements. 21 *C.F.R.* § 812.1. Pursuant to FDA regulations, Valley Hospital established an Institutional Review Board to monitor AMO's investigational study. 21 *C.F.R.* § 56.102g. Dr. Newman was an "investigator" in the study, meaning that he conducted the clinical investigation of AMO's IOL. He implanted the IOL in Baird's eye pursuant to that investigation.

In a clinical investigation of a device subject to an IDE, the FDA requires that the consent of a participating patient be informed. 21 *C.F.R.* §§ 50.1 to –.27. To satisfy that requirement, the investigator must describe the experimental nature of the treatment, its risks and benefits, and alternative courses of treatment. 21 *C.F.R.* § 50.25. Under most circumstances, moreover, the patient must sign an informed consent form. 21 *C.F.R.* § 50.27.

The consent form that Baird signed was entitled "Informed Consent for Cataract Operation and/or Implantation of Intraocular Lens." Previously, the FDA had found that this form satisfied the FDA's minimum standards for obtaining informed consent. The Consent Form described alternative treatments to IOLs, discussed the fact that the operation was part of a clinical investigation by the FDA to research the safety and efficacy of IOLs, explained the nature of the procedure, and outlined its risks and potential complications.[1]

---

[1] The consent provided, in pertinent part:

*INTRODUCTION*

This information is given to you so that you can make an informed decision about having eye surgery. . . .

\* \* \*

*ALTERNATIVE TREATMENTS*

I understand I may decide *not* to have a cataract operation *at all.* However, should I decide to have an operation, I understand these are the three methods of restoring useful vision after the operation.

 1. *SPECTACLES (GLASSES)* . . . .

 2. *CONTACT LENS* . . . .

### 3. INTRAOCULAR LENS

This is a small plastic artificial lens (some with polypropylene, nylon or metal supports) surgically placed inside the eye, permanently. With the intraocular lens there is no apparent change in the size of objects seen. Conventional eyeglasses (not cataract spectacles) are usually required in addition to an intraocular lens. Although the implantation of this intraocular lens is an investigational procedure, approved intraocular lenses are available as an alternative.

### CLINICAL INVESTIGATION

The United States Food and Drug Administration, in response to Congressional mandate, is requiring an extensive clinical investigation of intraocular lenses to establish facts about safety and efficacy. I understand I have been asked to take part in this study because my doctor considers me a candidate.... If for any reason I wish to decline participation in the study, I may do so without affecting my future care. I further understand that my participation is voluntary and that I will receive no compensation. It is estimated that several hundred thousand individuals will receive intraocular lenses as patients in this study.

### CONSENT FOR OPERATION

In giving my permission for a cataract extraction and/or for the possible implantation of an intraocular lens in my eye, I declare I understand the following information:

\* \* \*

3. The results of surgery in my case cannot be guaranteed.

\* \* \*

5. *Complications of surgery to remove the cataract:* As a result of the surgery, it is possible that my vision could be made worse. In some cases, complications may occur weeks, months or even years later. Complications may include hemorrhage (bleeding), loss of corneal clarity, infections, detachment of the retina, glaucoma, and/or double vision. These and other complications may occur whether or not a lens is implanted and may result in poor vision, total loss of vision or loss of the eye.

6. *Specific complications of lens implantation:* Insertion of an investigational intraocular lens may induce complications which otherwise would not occur. In some cases, complications may develop during surgery from implanting the lens, or days, weeks, months and even.years later. Complications may include loss of corneal clarity, infection, uveitis, iris atrophy, glaucoma, bleeding in the eye, inability to dilate pupil, dislocation of the lens and retinal detachment.

\* \* \*

8. *Complications of surgery in general:* As with all types of surgery, there is the possibility of other complications due to anesthesia, drug reactions or other factors which may involve other parts of my body, including a possibility of brain damage or even death. Since it is impossible to state every complication that may occur as a result of surgery, the list of complications in this form is incomplete.

In her deposition, Baird admitted that she signed the consent form, but she did not recall reading it. She said that Dr. Newman did not explain the consent form, that she did not know she was participating in an investigational study, or that the FDA had not approved the lens for general marketing to the public. Baird also stated that she was unaware of the availability of other IOLs that the FDA had fully approved. Notwithstanding the cataract in Baird's left eye, nothing in the record suggests that she could not read the form. Although Dr. Newman does not recall the details of his conversation with Baird, he avers that "his practice was to explain to the patient the nature of a cataract, cataract surgery, and of an intraocular lens." He also would explain the types of intraocular lenses, as well as the risks and prognosis of surgery.

Dr. Newman also told Baird that, following the cataract surgery, she should expect to stay overnight at Valley Hospital. After surgery, however, Dr. Newman informed Baird of "complications," and she remained in the hospital for three days.

Baird's eyesight worsened, and she returned to Dr. Newman's office numerous times. She stated that "I was in a lot of pain, I just knew there was something not right." She thought Dr. Newman "was a good doctor," and continued to consult him after the surgery, but never asked him the cause of her difficulties.

---

The basic procedures of cataract surgery and the advantages and disadvantages, risks and possible complications or alternative treatments have been explained to me by the doctor.... I understand that I will receive no compensation in the event a research related injury should occur.... In the event that I incur any injury related to this research, I will contact my doctor immediately. I understand that the implantation of an intraocular lens in my eye is part of a research investigation.... I give permission for medical data concerning my operation and subsequent treatment to be submitted to the lens manufacturer and to the FDA for the clinical study described. I understand I may withdraw from the clinical study at any time without jeopardizing my future medical care. In signing this informed consent for cataract operation, and/or implantation of intraocular lens, I am stating I have read this informed consent (or it has been read to me) and I fully understand it and the possible risks, complications and benefits that can result from surgery.

Because of Baird's complications, on March 9, 1984, Dr. Newman performed laser surgery on her left eye at the New York Eye and Ear Infirmary. Baird continued to experience problems with her left eye, including photophobia (an unusual intolerance to light), intermittent pain, and severe eye infections. She stated that after laser surgery her eyesight was "terrible," and was worse than before laser surgery.

Dr. Newman then referred Baird to Dr. James Bastek, a retinal specialist. According to Baird, she "was having a lot of pain, you know, and I had those infections, but my eye always hurt me and it would swell." She could see only a slight amount of light through her left eye.

On June 5, 1984, when Dr. Bastek first saw Baird, he diagnosed pseudopathic vitritis of her left eye and cystoid macular edema. Vitritis is an inflammation of the fluid that collects in the back of the lens of the eye. Cystoid macular edema is a cystic degeneration of the retina that may occur after cataract extraction. Dr. Bastek advised Baird that a vitrectomy would most likely be needed, but that he would first administer Kenalog injections to increase her vision. A vitrectomy is a procedure involving the removal of the contents of the vitreous chamber and replacement with a sterile saline solution. Kenalog is the trade name for a synthetic glucuosteroid. Dr. Bastek referred Baird back to Dr. Newman and asked her to return in one month.

Baird, however, left Dr. Newman's care on August 9, 1984. Although Dr. Newman expected her to return to him for additional treatment, Baird stopped seeing Dr. Newman "[b]ecause I wasn't getting any results in my eyesight and I figured all those operations, I didn't want to go through any more operations because it wasn't making my eyesight any better, it was just steadily getting worse." She felt "very disillusioned" about "[t]he whole thing."

Dr. Bastek performed the vitrectomy on Baird's left eye on April 15, 1985. Her eyesight, however, did not improve. Dr. Bastek continued to treat Baird for several months after the

surgery, seeing her for the last time on June 6, 1985. Although Dr. Bastek expected her to return to him, she never did. After leaving Dr. Bastek's care, Baird consulted three other ophthalmologists between 1989 and 1993.

On or about March 24, 1991, Baird saw in the *Bergen Record* an advertisement placed by her attorney's law firm. The advertisement referred to eye injuries from cataract surgery. Baird concluded that her problems following the implantation of the IOL in 1983 were similar to the problems described in the advertisement. On contacting the law firm, she claimed she learned for the first time that the FDA had not approved AMO's IOL for general marketing to the public.

Other portions of her testimony reveal that she was aware that the lens was the cause of her problems. At her deposition, Baird testified, "I had nothing, but problems from the first day I went to that hospital and even after I had the vitrectomy it just seemed to get worse and worse." She also indicated that she "just knew" that the IOL Dr. Newman implanted in her eye was the source of her problems because of the infections and the need for additional surgery. Baird started to think that Dr. Newman's surgery was the source of her problems right after he performed the cataract surgery. As Baird stated, "I felt that my problems started right from the very beginning when he first did my cataract surgery. I hadn't had any problem like that before." At the *Lopez* hearing, see *Lopez v. Swyer*, 62 *N.J.* 267, 300 *A.2d* 563 (1973), Baird also indicated that, even before she saw the newspaper advertisement, "I felt that [my problems with my eyesight] must have been caused by the lens because I didn't have that problem before, the infection and all that I had after the surgery."

Baird's complaint alleged that both Dr. Newman and Valley Hospital failed to obtain her informed consent to the cataract surgery. She did not allege claims for medical malpractice or battery against the doctor or the hospital. Baird also asserted claims against AMO for product-liability, breach-of-warranty,

fraudulent misrepresentation, failure-to-warn, and failure to obtain her informed consent.

On April 20, 1994, the Law Division decided motions for summary judgment filed by defendants AMO and Dr. Newman. It granted AMO's motion for summary judgment, reasoning that 21 *U.S.C.* § 360k preempted common-law claims against manufacturers of IOLs to which the FDA has granted IDEs. The court denied Dr. Newman's motion for summary judgment based on federal preemption. Dr. Newman then moved for summary judgment based on the applicable statute of limitations, *N.J.S.A.* 2A:14–2. At the conclusion of a *Lopez* hearing, the Law Division ruled that the statute of limitations barred Baird's complaint. The court found that Baird was "fully aware" that she suffered damages as a result of the 1983 cataract surgery; that a person of reasonable diligence would have known that her damages were caused by the fault of another; that her cause of action accrued by 1985 at the latest; and, consequently, that the statute tolled at least no later than 1987.

Finally, on May 12, 1994, Valley Hospital filed a motion for summary judgment. It argued, among other things, that the physician, not the hospital, has the duty to obtain a patient's informed consent to a particular procedure. On July 8, 1994, the Law Division granted Valley Hospital's motion, concluding that Valley Hospital did not have a duty to obtain Baird's informed consent.

The Appellate Division reversed the summary judgment in favor of all three defendants. 301 *N.J.Super.* 7, 693 *A.*2d 904 (App.Div. 1997). Relying on *Lombardo v. Borsky*, 298 *N.J.Super.* 658, 690 *A.*2d 150 (App.Div.), *certif. granted*, 150 *N.J.* 28, 695 *A.*2d 671 (1997), and *appeal dismissed*, 153 *N.J.* 44, 707 *A.*2d 149 (1998), the Appellate Division held that the statute of limitations did not bar Baird's informed consent claim against Dr. Newman. The court reasoned that Baird had not learned of the investigational status of AMO's IOL until 1991. 301 *N.J.Super.* at 11, 693 *A.*2d 904. Next, the Appellate Division concluded that a more complete

factual record was necessary to resolve Baird's informed consent claim against Valley Hospital. *Id.* at 12, 693 *A.*2d 904. Finally, relying on *Medtronic, Inc. v. Lohr,* 518 *U.S.* 470, 116 *S.Ct.* 2240, 135 *L. Ed.*2d 700 (1996), the Appellate Division reversed the lower court's dismissal of Baird's complaint against AMO. 301 *N.J.Super.* at 18, 693 *A.*2d 904. The Appellate Division read *Medtronic* to hold that the MDA preempts state common-law claims only to the extent that the FDA has adopted a regulation inconsistent with or in conflict with a requirement of state law. *Id.* at 15, 693 *A.*2d 904. Because AMO failed to identify how Baird's state-law claims conflicted with any federal law requirement, the Appellate Division held that federal law did not preempt Baird's common-law claims. *Id.* at 18, 693 *A.*2d 904.

## II.

### A.

The statute of limitations governing actions for personal injuries requires a plaintiff to commence an action within two years after the cause of action shall have accrued. *N.J.S.A.* 2A:14–2.[2] The statute, however, is silent on when a cause of action will be deemed to have "accrued." Consequently, the determination of the accrual of a cause of action is an issue for the court. *Fernandi v. Strully,* 35 *N.J.* 434, 439, 173 *A.*2d 277 (1961). In the context of a medical malpractice action, a cause of action generally accrues on the date that the alleged act or omission occurred. *Bauer v. Bowen,* 63 *N.J.Super.* 225, 230, 164 *A.*2d 357 (App.Div.1960).

To ameliorate the "often harsh and unjust results which flow from a rigid and automatic adherence to a strict rule of law," courts have developed the discovery rule. *Lopez, supra,* 62 *N.J.*

---

[2] This statute provides: "Every action at law for an injury to the person caused by the wrongful act, neglect or default of any person within this state shall be commenced within 2 years after the cause of any such action shall have accrued."

at 273–74, 300 *A.*2d 563. The discovery rule delays the accrual of a cause of action until "the injured party discovers, or by an exercise of reasonable diligence and intelligence should have discovered that he may have a basis for an actionable claim." *Id.* at 272, 300 *A.*2d 563.

Critical to the running of the statute is the injured party's awareness of the injury and the fault of another. *Savage v. Old Bridge–Sayreville Medical Group, P.A.,* 134 *N.J.* 241, 243, 633 *A.*2d 514 (1993). The discovery rule prevents the statute of limitations from running when injured parties reasonably are unaware that they have been injured, or, although aware of an injury, do not know that the injury is attributable to the fault of another. *Tevis v. Tevis,* 79 *N.J.* 422, 432, 400 *A.*2d 1189 (1979).

## B.

The decisive question in this case is when Baird discovered or by the exercise of reasonable diligence should have discovered that her injuries were causally related to Dr. Newman's implantation of AMO's IOL in her left eye and to the alleged failure to obtain her informed consent.

Baird filed this action over eight years after Dr. Newman's cataract surgery. Her testimony leaves no doubt that she knew of the origin and existence of her injuries shortly after her surgery in 1983. She does not dispute that after Dr. Newman's surgeries she experienced considerable pain and infections. She also required laser treatment. After her cataract surgery, her eyesight never improved. She knew something was "not right." Nonetheless, she never asked Dr. Newman the cause of the pain, inflammation, and infection in her left eye. After Dr. Newman performed laser surgery, her eyesight was "terrible," and she experienced a severe infection. She was "very disillusioned" as a result of the surgery, pain, the infections, and need for additional surgery. In sum, she "just knew" that the implant was the source of her problems.

At the *Lopez* hearing, she testified that she felt that something was "wrong" following the cataract surgery, and that there had to be a "problem." While she was recuperating in the hospital, Dr. Newman told her of "complications" or a "problem." She stated that he did not explain the problem to her, and that she did not inquire of him. Yet, she later overheard Dr. Newman tell Dr. Bastek that he was referring her to him because there was a "problem." Dr. Bastek confirmed that she had a "problem," and that he needed to perform a vitrectomy. As Baird testified:

Q: Did you think [Dr. Newman] had done something wrong?

A: I figured that there had to be a problem of some kind from the surgery.

\* \* \*

Q: Did you think something was wrong with the lens?

A: I just knew that there was something wrong with the surgery right from the beginning because I hadn't had those problems prior to that time.

Baird treated with Dr. Newman from September 23, 1983, to August 9, 1984. She returned to him after cataract surgery because she thought he was a "good doctor." As her complications continued, however, she became disillusioned with his treatment.

Q: Why did you stop seeing Dr. Newman?

A: Because I wasn't getting any results in my eyesight and I figured all those operations, I didn't want to go through any more operations because it wasn't making my eyesight any better, it was just steadily getting worse.

\* \* \*

Q: So how come you were dissatisfied with Dr. Newman . . . ?

A: Well, because I felt that my problems started right from the beginning when he first did my cataract surgery. I hadn't had any problems like that before.

\* \* \*

Q: When did you start to think that?

A: When he sent me to New York Eye.

Baird treated with Dr. Bastek between June 1984 and June 1985. Although her eyesight never improved after Dr. Newman's 1983 surgery, she did not consult a physician other than Dr. Bastek until 1989.

Hence, Baird's own testimony establishes that no later than 1985 she knew enough to discover her cause of action against Dr. Newman. Baird believed that she had been injured by Dr. Newman's surgery, that she knew who had performed the surgery, that her eyesight worsened as a result of the surgery, and that she became dissatisfied with Dr. Newman's treatment and switched to another physician. Under the standard set forth in *Lopez*, Baird knew at least by 1985 of facts that would have alerted a reasonable person that her eye injuries were possibly, if not probably, caused by the fault of another.

Baird, however, maintains that she was not aware of the investigational status of AMO's IOL until 1991, when she read her attorney's advertisement in the *Bergen Record*. Until then, she contends, although she knew she had problems from the surgery, she did not know she had a right to be informed of the investigational status of the IOL.

In effect, she concludes that her complaint was timely because she did not discover the legal theory—lack of informed consent—against Dr. Newman until at least 1991. As the Law Division noted, however, the question is not whether Baird could articulate a specific cause of action before 1991. For the statute of limitations to run, the injured party need not know the "state of the law positing a right of recovery upon the facts." *Burd v. New Jersey Tel. Co.*, 76 *N.J.* 284, 291–92, 386 *A.*2d 1310 (1978). Instead, the statute of limitations runs when the injured party possesses actual or constructive knowledge "of that *state of facts* which may equate in law with a cause of action." *Id.* at 291, 386 *A.*2d 1310 (emphasis in original). The "basis" of such a cause of action, "is, of course, constituted solely by the material facts of the case." *Id.* at 292, 386 *A.*2d 1310. Thus, the statute of limitations begins to run when the plaintiff is aware, or reasonably should be aware, of facts indicating that she has been injured through the fault of another, not when a lawyer advises her that the facts give rise to a legal cause of action.

Hence, the pertinent inquiry is when did Baird become aware that she had sustained damages as the result of the fault of an identifiable person. Shortly after she began to experience difficulties with her left eye, Baird knew her injury was related to Dr. Newman's implantation of the lens. That knowledge required Baird to take steps to investigate whether she had any claim against Dr. Newman or any other party, for medical malpractice or the failure to obtain a consent from her that was informed.

In holding that the statute of limitations did not bar Baird's informed consent claim against Dr. Newman, the Appellate Division panel relied on its earlier decision in *Lombardo v. Borsky, supra,* 298 *N.J.Super.* 658, 690 *A.*2d 150. *Lombardo,* like the instant case, arose from the 1982 implantation of an IOL that was subject to an IDE. *Id.* at 661–63, 690 *A.*2d 150. Soon after the defendant, Dr. Borsky, performed surgery, Lombardo experienced various problems, including pain and loss of vision. *Id.* at 662, 690 *A.*2d 150. Dr. Borsky had not warned Lombardo of the complications, and she suspected that the lens and surgery had caused her injury. *Ibid.* Lombardo consulted other doctors over the following five years and underwent additional surgery. Although Lombardo thought Dr. Borsky had done something wrong, she returned to his care in 1988. *Ibid.* In late 1990, after a family member read an article concerning investigational IOLs, Lombardo learned for the first time that she had participated in an investigational study of an IOL. *Id.* at 665, 690 *A.*2d 150. Dr. Borsky admitted that he had no basis for suggesting that she knew earlier of the investigational status of the IOL. *Id.* at 667, 690 *A.*2d 150. Lombardo asserted a claim against Dr. Borsky for failure to obtain her informed consent, but not one for medical malpractice. *Id.* at 663, 690 *A.*2d 150.

At the conclusion of a *Lopez* hearing, the Law Division determined that Lombardo knew by 1988 that she had a serious eye problem, that Dr. Borsky had not told her about any risks from the defective lens, and that the lens he had implanted was causing Lombardo's problems. *Id.* at 663, 690 *A.*2d 150. Accordingly, the

Law Division concluded that the statute of limitations barred Lombardo's action. *Ibid.*

The Appellate Division reversed. Although it recognized that Lombardo knew enough to file a medical malpractice claim earlier, the court held that Lombardo's informed consent claim did not accrue until she became aware of the IOL's investigational status in late 1990. *Id.* at 667, 690 *A.*2d 150. The issue, according to the court, was "not when a cause of action accrued against Dr. Borsky with respect to a medical malpractice case," but rather when a cause of action accrued based on a lack of informed consent. *Id.* at 663, 690 *A.*2d 150. Thus, Lombardo's informed consent complaint could not be dismissed "when there is no contention she earlier knew or reasonably should have known the implanted lens was experimental." *Id.* at 667, 690 *A.*2d 150. Recently, another panel of the Appellate Division disagreed with the holding in *Lombardo* and the decision under review in this appeal. *Bennett v. Surgidev Corp.,* 311 *N.J.Super.* 567, 710 *A.*2d 1023, 1025 (App. Div. 1998).

 Underlying *Lombardo* is the premise that a medical malpractice claim differs so fundamentally from one based on the failure to obtain a patient's informed consent that the statute of limitations on the consent claim should start running on a date different from that applicable to the malpractice claim. Like an action for medical malpractice, one based on the failure to obtain an informed consent, however, is based on negligence. *Perna v. Pirozzi,* 92 *N.J.* 446, 459, 457 *A.*2d 431 (1983); *Lugenbuhl v. Dowling,* 701 *So.*2d 447, 452 (La.1997); *see also* W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* 190 (5th ed.1984) (stating that negligence has replaced battery as the basis of a lack-of-informed-consent action); 1 Fowler V. Harper, et al., *The Law of Torts* § 310 n. 20 (2d ed. 1988) ("Most authorities ... prefer to treat informed consent liability solely as an aspect of malpractice or negligence, rather than battery.... [T]he problem of informed consent is essentially one of professional responsibility, not intentional wrongdoing, and can be handled more coherently within the

framework of negligence law than as an aspect of battery."). The negligence lies in the physician's failure to disclose sufficient information for the patient to make an informed decision about the comparative risks of various treatment options. *Perna, supra,* 92 *N.J.* at 459, 457 *A.*2d 431; *Skripek v. Bergamo,* 200 *N.J.Super.* 620, 633, 491 *A.*2d 1336 (App.Div.), *certif. denied,* 102 *N.J.* 303, 508 *A.*2d 189 (1985).

Plaintiffs who are aware that they have been injured due to the fault of another should not be able to postpone the institution of a timely action merely by picking one theory of recovery over another. *Lombardo* inappropriately shifts the emphasis from awareness of injury due to the fault of another to awareness of sufficient facts to support all possible theories of recovery. In most cases, medical malpractice and informed consent claims will conform so closely that knowledge of facts sufficient to start the statute of limitations on one claim should start running on the other. The statute should start running on both claims when injured parties know of their injuries and of facts sufficient to support the institution of either claim. A rule that would permit different periods of limitations would fragment the two claims. Diligence requires an injured party, once he or she knows of one claim against a defendant, to investigate other related claims. Accordingly, we take this occasion to overrule *Lombardo.*

In the rare case when the claims are not congruent, the plaintiff may look to the discovery rule for relief. Unlike the cases cited by the dissent, *post* at (slip op. at 2–4), the present case does not involve the commission of fraud on elderly, uneducated nursing home patients by inserting experimental IOLs "under the ruse of removing cataracts," *Anderson v. George H. Lanier Memorial Hosp.,* 982 *F.*2d 1513, 1519 (11th Cir.1993); an orthopedist's fraudulent concealment of the use of experimental screws by misrepresenting that the patient's complications were part of the healing process, *Shadrick v. Coker,* 963 *S.W.*2d 726, 736 (Tenn. 1998); or a conspiracy to conceal chemical tests on human subjects, *Barrett v. United States,* 689 *F.*2d 324 (2d Cir.1982), *cert.*

*denied,* 462 *U.S.* 1131, 103 *S.Ct.* 3111, 77 *L. Ed.*2d 1366 (1983). In such cases, the equitable principles underlying the discovery rule may allow tolling of the statute of limitations.

■ Baird, however, knew or should have known of sufficient facts to start the statute of limitations running on both the medical malpractice and informed consent claims. She experienced multiple complications with her eye, which she related to the lens implant. Although the Appellate Division concluded that "[i]t is undisputed that plaintiff was not aware the implanted lens was an experimental IOL until March 1991," 301 *N.J.Super.* at 11, 693 *A.*2d 904, the record does not support that conclusion. Dr. Newman proceeded only after Baird signed a detailed consent form that described the investigational status of the IOL.

Contrary to the dissent, *post* at 81, 713 *A.*2d at 1033, our holding turns not on the preclusive effect of the consent signed by plaintiff, but on her failure to institute a timely action. The point is not that the execution of the form necessarily establishes that plaintiff's consent was informed, but that she must institute a timely action in which that issue may be resolved. The Law Division has already conducted a *Lopez* hearing in which it has determined that plaintiff knew that she had suffered damages because of her surgery in 1983 and that the statute ran on her claims no later than 1987. Consequently, no further hearing is necessary on the dismissal of plaintiff's claim against Dr. Newman.

Because of our disposition of Baird's claim against Dr. Newman, we remand the matter to the Law Division so Valley Hospital and AMO similarly may move for dismissal on the basis of the statute of limitations.

### III.

■ Our disposition of the appeal by recourse to the statute of limitations obviates the need to determine whether the MDA preempts Baird's state common-law claims against AMO. Although we refrain from determining so complex and unsettled an

issue, we nonetheless note our general agreement with the Appellate Division that the MDA does not preempt Baird's claims against AMO.

Notwithstanding our abstention from a detailed discussion of the issue of the MDA's preemptive effect, some additional comments are appropriate. At the heart of the preemption analysis is the fractured opinion of the U.S. Supreme Court in *Medtronic, Inc. v. Lohr*, 518 *U.S.* 470, 116 *S.Ct.* 2240, 135 *L. Ed.*2d 700 (1996), in which the court considered the MDA's express preemption provision.[3] Although badly divided, a majority of the *Medtronic* Court nonetheless held that the MDA did not preempt the plaintiff's state common-law claims for defective design, defective manufacture, failure-to-warn, and failure to comply with FDA standards. *Medtronic, supra, 518 U.S.* at 492–502, 116 *S.Ct.* at 2254–258.

One difference between *Medtronic* and the present case is that *Medtronic* dealt with a provision of the MDA stating that devices "substantially equivalent" to devices that preexisted the MDA's enactment are exempt from the rigorous PMA review. *Id.* at 477–79, 116 *S.Ct.* at 2247 (citing 21 *U.S.C.* 360e(b)(1)(B)). In comparison, the FDA approved the subject IOL pursuant to an IDE. Although both "substantially equivalent" devices and those approved pursuant to an IDE are exempt from the PMA process, the FDA's review of IDE applications is somewhat more intensive.

The opinions in *Medtronic*, although various, permit us to distill some general principles. First, the MDA may preempt a

---

[3] This provision states:

Except as provided in subsection (b) of this section, no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement-

(1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and

(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

[21 *U.S.C.* § 360k(a).]

state-law tort claim, as well as a claim based on a state statute or regulation. *Id.* at 503–06, 116 *S.Ct.* at 2259–60 (Breyer, J., concurring in part and concurring in judgment); *id.* at 508–13, 116 *S.Ct.* at 2262–63 (O'Connor, J., concurring in part and dissenting in part). To preempt a state-law claim, the federal requirement must specifically apply to a particular medical device, the state requirement must also apply specifically, and the state requirement must add to or be different from the federal requirement. *Id.* at 498–502, 116 *S.Ct.* at 2257–58 (plurality opinion).

When interpreting *Medtronic,* state and federal courts have reached conflicting conclusions concerning the MDA's preemptive effect on claims for injuries caused by devices that are the subject of an IDE. *Compare Oja v. Howmedica, Inc.,* 111 *F.*3d 782 (10th Cir.1997) (holding that plaintiff's failure-to-warn cause of action against manufacturer of investigational hip prothesis not preempted); *Shea v. Oscor Medical Corp.,* 950 *F.Supp.* 246 (N.D.Ill.1996) (holding that plaintiff's strict products liability cause of action against manufacturer of cardiac fibrillator not preempted); *Niehoff v. Surgidev Corp.,* 950 *S.W.*2d 816 (Ky.1997) (holding that plaintiff's strict liability and negligence causes of action against manufacturer of investigative IOL not preempted), *cert. denied,* —— U.S. ——, 118 *S.Ct.* 1187, 140 *L.Ed.*2d 317 (1998); *Connelly v. Iolab Corp.,* 927 *S.W.*2d 848 (Mo.1996) (holding that plaintiff's negligence, strict liability, failure-to-warn, lack of informed consent, and fraud claims against manufacturer of investigative IOL not preempted), *cert. dismissed sub. nom. Iolab Corp. v. Hunter,* —— U.S. ——, 117 *S.Ct.* 2429, 138 *L. Ed.*2d 191 (1997) *with Chambers v. Osteonics Corp.,* 109 *F.*3d 1243 (7th Cir.1997) (holding that state common-law claims for strict liability and implied warranty of merchantability against manufacturer of IDE device preempted; negligent manufacturing claim that alleged that manufacturer had not complied with FDA requirements not preempted); *Martin v. Telectronics Pacing Systems, Inc.,* 105 *F.*3d 1090 (6th Cir.1997) (holding that plaintiff's manufacturing defect, design defect, inadequate warning, and breach of warranty causes of action against manufacturer of investigational pacemaker

preempted), *cert. denied*, —— U.S. ——, 118 *S.Ct.* 850, 139 *L. Ed.*2d 751 (1998); *Chmielewski v. Stryker Sales Corp.*, 966 *F.Supp.* 839 (D.Minn.1997) (holding that plaintiff's negligent design, failure to warn, and strict liability claims preempted); *Berish v. Richards Medical Co.*, 937 *F.Supp.* 181 (N.D.N.Y.1996) (holding that plaintiff's negligence and strict liability causes of action against manufacturer of investigative prosthetic hip preempted, but action for negligent manufacture not preempted to extent it alleged failure to comply with federal regulations).

Much of the conflict centers on *Medtronic*'s requirement that the state-law claim apply specifically to medical devices. *Compare Oja, supra,* 111 *F.*3d at 789 (noting that "duties imposed by Oja's negligent failure to warn claim do not constitute positive enactments of state law sufficient to constitute a state requirement developed 'with respect to' medical device; instead it's a 'general duty to warn' "); *Niehoff, supra,* 950 *S.W.*2d at 822 (stating that "Kentucky's strict liability case law and statutes are laws of general applicability and fall beyond the scope of the federal preemption under § 360k") *with Martin, supra,* 105 *F.*3d at 1099–1100 (reasoning that, though plaintiff's causes of action were not specifically developed with regard to medical devices, such statutes would impede implementation and enforcement of specific federal requirements and would "thwart the goals of the IDE exemption"); *Chmielewski, supra,* 966 *F.Supp.* at 842 ("[T]he fact that plaintiffs' claims are based on general common law duties does not save them from being preempted, if a conflicting device-specific federal regulation exists."); *Berish, supra,* 937 *F.Supp.* at 185 (noting that IDEs are subject to specific regulations, and state common-law tort claims would impose additional requirements on IOLs subject to IDEs). Courts considering medical devices approved pursuant to the PMA process also have struggled with *Medtronic*'s device-specific state law requirement. *See, e.g., Armstrong v. Optical Radiation Corp.*, 50 *Cal.App.* 4th 580, 594–95, 57 *Cal.Rptr.*2d 763 (1996) (holding that state law requirements imposed by negligence and strict liability theories are "based on general principles of state tort law which were not specifically

developed with respect to medical devices"); *Kernats by Kernats v. Smith Indus. Medical Sys., Inc.*, 283 *Ill.App.*3d 455, 218 *Ill.Dec.* 774, 669 *N.E.*2d 1300, 1309 (Ill.App.) (stating that "plaintiff's common-law claims based on the manufacture of the CVS catheter, the failure to warn, and inadequate instructions, are also 'general obligations' applicable to all manufacturers and, under the holding in *Medtronic,* are not requirements specifically established for medical devices"), *appeal denied,* 169 *Ill.*2d 569, 221 *Ill.Dec.* 439, 675 *N.E.*2d 634 (1996) and *cert. denied,* —— U.S. ——, 118 *S.Ct.* 684, 139 *L.Ed.*2d 631 (1998); *Walker v. Johnson & Johnson Vision Prod., Inc.*, 217 *Mich.App.* 705, 552 *N.W.*2d 679, 686 (Mich.Ct.App.1996) (noting that "[s]tate common law is a law of general applicability"); *Wutzke v. Schwaegler,* 86 *Wash.App.* 898, 940 *P.*2d 1386, 1391 (1997) (stating that Washington's product liability law contains " 'requirements of general applicability where the purpose of the requirement relates . . . to other procedures in addition to devices' ") (quoting 21 *C.F.R.* § 808.1(d)(1)), *rev. denied,* 134 *Wash.*2d 1003, 953 *P.*2d 96 (1998).

After the Appellate Division rendered its opinion, the FDA proposed regulations that clarify that the MDA generally does not preempt state-law claims. Specifically, the proposed regulations state that they seek to elucidate the FDA's "longstanding interpretation of section [360k(a) ] . . . as generally not preempting available legal remedies, including state common-law claims." 62 *Fed.Reg.* 65387 (1997) (to be codified at 21 *C.F.R.* pt. 808)(proposed Dec. 12, 1997).

Our reading of *Medtronic* and the proposed FDA regulations leads us to conclude that the United States Supreme Court, Congress, and the FDA do not intend that claims such as plaintiff's should be preempted. Those authorities must speak more clearly if they wish to prevent consumers who have been injured by experimental medical devices from maintaining state-law claims to recover for their injuries. Because the MDA does not provide a federal remedy for injured consumers, preemption of state-law

claims would eliminate any remedy for them and effectively immunize manufacturers of investigational devices from liability.

The judgment of the Appellate Division is modified, and the matter is remanded to the Law Division.

O'HERN, J., dissenting.

Only one such as Anatole France [1] could adequately capture the irony in the Court's judgment. A sight-impaired woman has lost her claim that she was the unwitting subject of experimental eye surgery in part because she should have more carefully read the release form that she signed before undergoing the surgery. *Ante* at 72, 713 *A*.2d at 1028. In order to reach that result the Court has improperly fused the accrual of two separate claims and thereby avoids resolution of a factual dispute whether plaintiff was informed of the experimental nature of the eye surgery.

## A.

### Must the claims of medical malpractice and lack of informed consent accrue simultaneously?

I have found no jurisdiction in which a subject of a medical experiment has had an informed consent claim dismissed without resolution of the question of when the patient had been informed of the experimental nature of the procedures involved. In *Anderson v. George H. Lanier Memorial Hospital*, 982 *F*.2d 1513,

---

[1] It was he who reminded us of "the majestic equality of the laws, which forbid rich and poor alike to sleep under the bridges, to beg in the streets, and to steal their bread." Anatole France, *Le Lys Rouge, in Five Works of Anatole France* 91 (W. Stephens trans.1924) (1896).

1519 (11th Cir.1993), the medical provider argued that the nondisclosure claims were "intertwined with medical malpractice claims" and that the statute of limitations governing the malpractice claims should bar the informed consent claims. The court disagreed. It found the claim that the patients alleged was that the hospital "did not obtain their informed consent concerning an experimental procedure." *Id.* at 1519. The court observed: "The appellants may have been put on notice that [the physician] negligently performed their eye surgeries. The appellants, however, were not placed on notice that they were the victims of an experimental procedure." *Id.* at 1520. In *Shadrick v. Coker,* 963 *S.W.*2d 726 (Tenn.1998), an orthopedic patient was never told that a certain type of screw put in his back was experimental. He was well aware that the operation was unsuccessful. For over three years following removal of the screws, he continued to have pain in his back. *Id.* at 729. It was not until December 17, 1993, that he saw a television program ("20–20") containing a segment on pedicle screws. He learned from that program that the screws were experimental and had not been approved by the Food and Drug Administration for use in the spine. The television show also informed him that such screws had been found to cause a number of problems to patients. *Id.* at 729. The Tennessee court observed that the cause of action based on the lack of informed consent "stems from the premise that a competent patient should be allowed to formulate an intelligent, informed decision about surgical or other treatment procedures the patient undertakes." *Id.* at 731. It found that the cause of action based on the lack of informed consent did not accrue until the patient viewed the 1993 television program disclosing the experimental nature of the treatment. It reached that conclusion even though Mr. Shadrick knew when he woke up from the surgery that screws had been implanted without his consent, and even though he learned just a few months later that one of the screws had broken. *Id.* at 734; *see also Barrett v. United States,* 689 *F.*2d 324, 328–29 (2nd Cir.1982) (distinguishing claim based on negligent administration of a drug from claim based on concealment of fact that Army used decedent

as a "human guinea pig," and finding factual dispute as to when the latter claim accrued under the "diligence-discovery" rule).

The majority reasons that the statute of limitations should start running on both claims when injured parties know of their injuries and of facts sufficient to support the institution of either a medical malpractice or an informed consent claim. *Ante* at 71, 713 *A.*2d at 1027. The homogenization of the two claims is flawed.

It is shattering to think that a person who was essentially a guinea pig should be deprived of her cause of action based on absence of informed consent because she knew something was wrong with her eyes after the surgery. The majority reasons that "diligence requires an injured party, once he or she knows of one claim against the defendant, to investigate all other related claims." *Ante* at 71, 713 *A.*2d at 1028. The proposition may be valid in other contexts, but its relevance to this case rests shakily on the unstated premise that plaintiff's malpractice and informed consent claims are inextricably related. I cannot accept that premise because the two claims share neither a legal nor a factual relationship. Legally, plaintiff's informed consent action derives from her rights of self-determination and personal integrity. *Largey v. Rothman,* 110 *N.J.* 204, 209, 540 *A.*2d 504 (1988). It is a dignitary tort. Unlike the malpractice claim, a plaintiff suing under the informed consent theory may prevail without proving physical damage. *Lugenbuhl v. Dowling,* 701 *So.*2d 447, 455 (La.1997). Factually, the informed consent action arises out of the alleged lack of disclosure prior to plaintiff's eye surgery. The malpractice claim on the other hand arises out of the operation itself. It is one thing to draw an inept surgeon. It is another thing to be treated as a human guinea pig.

A most unfortunate example of such experimental medicine is that of the Tuskegee volunteers. In that case, the federal government withheld treatment from 400 men suffering from syphilis. Researchers had discovered that penicillin treated syphilis effectively, but government health officials, interested in tracking the

natural course of the disease, treated the unwitting participants with placebos. *See generally* James H. Jones, *Bad Blood: The Tuskegee Syphilis Experiment* (1981). Let us assume that the victims of the placebo treatment knew that their condition was worsening, knew that something was going dreadfully wrong. Would their cause of action based on a lack of informed consent accrue when they first believed that their treatment was not working or would it accrue when they learned that important information concerning their health choices had been withheld from them? I would certainly hope that it would be the latter.

I therefore would follow the panel of the Appellate Division that twice held that a cause of action for lack of informed consent to experimental medical treatment accrues when the plaintiff learns that the surgery was experimental, not when the plaintiff discovers that something is wrong with his or her physical condition. *Baird v. American Med. Optics*, 301 *N.J.Super.* 7, 11–12, 693 *A.*2d 904 (App.Div.), *certif. granted*, 151 *N.J.* 467, 700 A.2d 879 (1997); *Lombardo v. Borsky*, 298 *N.J.Super.* 658, 667, 690 *A.*2d 150 (App.Div.), *certif. granted*, 150 *N.J.* 28, 695 A.2d 671 (1997), *appeal dismissed*, 153 *N.J.* 44, 707 A.2d 149 (1998).[2]

---

[2] I would also agree with the result reached by a separate panel in *Bennett v. Surgidev Corp.*, 311 *N.J.Super.* 567, 710 A.2d 1023 (App.Div.1998). In that case, the patient, Sylvia Bennett, knew that the IOL was "not perfected" when she consented to its implantation in 1982; and she knew something was wrong with her eyes following the surgery. Yet Bennett did not file her complaint until July 1991, which was eighteen or nineteen months after a doctor told her that the lens in her eye was "defective." *Id.* at 571, 710 A.2d 1023.

The appellate panel held that the informed consent claim was time-barred. *Id.* at 571, 710 A.2d 1023. That was an appropriate holding on the facts of that case, because Bennett knew that the IOL was "not perfected" at the time she consented to the procedure. Like the *Bennett* court, I see no difference between awareness that a device was "not perfected" and awareness that a device is "experimental." *Id.* at 574, 710 A.2d 1023. However, I would not go as far as the *Bennett* court was prepared to go in equating knowledge that the IOL did not work with knowledge that the device was experimental. *Ibid.* If a hypothetical patient did not know that a medical device was experimental at the time she consented to its use, her informed consent claim should not accrue when the patient discovers, for example, a manufacturing defect in the device. The

B.

### When did this patient become aware that she was the subject of a medical experiment?

The majority notes that plaintiff cannot establish a lack of informed consent because she signed a consent form that described the experimental nature of the intraocular lens (IOL).

Baird signed a detailed consent form that described the investigational status of the IOL. Although the Appellate Division concluded that "[i]t is undisputed that plaintiff was not aware the implanted lens was an experimental IOL until March 1991," 301 *N.J.Super.* at 11, 693 *A.*2d 904, the record does not support that conclusion. Dr. Newman proceeded only after Baird signed a detailed consent form that described the investigational status of the IOL.

[*Ante* at 72, 713 *A.*2d 1028.]

Of course, if malpractice and informed consent accrue simultaneously, it is unnecessary to discuss when plaintiff's informed consent claim arose. A reader might conclude that the Court's reference to the consent form arises from doubt about the fairness of its statute-of-limitations holding. Be that as it may, if the majority wishes to discuss the consent form that its holding renders moot, it should not draw incorrect inferences about the legal effect of that form. It is simply not the law of New Jersey that because a person has signed a form the person is bound by the form or informed of its contents. *Dancy v. Popp,* 114 *N.J.* 570, 572, 556 *A.*2d 312 (1989). Although a party is ordinarily bound by an instrument that he or she signs, she is not bound if there is evidence that she was misled or that provisions of the document were not adequately called to her attention. *See* John D. Calamari, *Duty to Read—A Changing Concept,* 43 *Fordham L.Rev.* 341, 342–49 (1974).

In this case plaintiff vigorously denies that she was aware of the investigational status of the IOL until many years after it was implanted, and she contends that her doctor made no effort to inform her that the implantation would be an experiment. There is a factual dispute on that issue. Because the dispute arises on a motion for summary judgment, and because as far as we can see

---

informed consent claim should not accrue until a patient discovers or should have discovered that she was denied the right to decide for herself whether to subject her body to medical experimentation.

there is no "single, unavoidable resolution of the alleged disputed issue of fact," we would have to resolve the dispute in plaintiff's favor, had the court not erroneously dismissed her case on statute-of-limitations grounds. *Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 540, 666 *A.2d* 146 (1995). Denying plaintiff the benefit of the doubt, as the majority suggests it would do, conflicts not only with our summary judgment law, but also with the spirit of the Medical Device Act (MDA). Senator Edward Kennedy, in introducing the MDA, explained to his colleagues that "the legislation is written so that the benefit of the doubt is always given to the consumer. After all it is the consumer who pays with his health and his life for medical device malfunctions." 121 *Cong. Rec.* 10,688 (1975). Eleanor Baird is being asked to pay with her health for experimentation on the IOL.

Because plaintiff's informed consent claim is distinct from her treatment claim, plaintiff is entitled to a factual hearing on whether her doctor was reasonably diligent in determining whether plaintiff understood that she was to be a laboratory animal in the service of medical science—whether she understood that the development of the IOL was still in the "anything can happen" stage. Michael E. Petrella, *License to Maim: Federal Pre-emption and the Medical Device Amendments of 1976,* 6 *Health Matrix* 349 (1996). Her signature on the consent form would serve as evidence at that hearing. It might in fact prevent her from prevailing. But at the summary judgment stage, her signature should not serve to deny her the opportunity to prove her case, as the majority suggests it would. Her entitlement to a hearing seems elementary to me and is not too much to ask for a woman who has lost her eyesight in a case of experimental surgery.

STEIN, J., joins in this opinion.

*For modification and remandment*—Chief Justice PORITZ, and Justices HANDLER, POLLOCK, GARIBALDI, and COLEMAN—5.

*For affirmance*—Justices O'HERN and STEIN—2.