747 A.2d 266

OLGA MARTINEZ, EXECUTRIX OF THE ESTATE OF CARL M. FARRISH, DECEASED, PLAINTIFF–APPELLANT, v. COOPER HOSPITAL–UNIVERSITY MEDICAL CENTER, DEFENDANT–RESPONDENT, AND MICHAEL CHONSKY, M.D., NADINE ROSENTHAL, M.D., JOHN DOES 1 THROUGH 10 (FICTITIOUS PERSONS) AND ABC COMPANIES 1 THROUGH 10 (FICTITIOUS COMPANIES), DEFENDANTS.

Argued November 30, 1999—Decided February 16, 2000.

*John J. Eichmann* argued the cause for appellant.

*Stacy L. Moore, Jr.*, argued the cause for respondent (*Parker, McCay & Criscuolo*, attorneys).

The opinion of the Court was delivered by

LONG, J.

*I*

When the discovery rule was first announced in *Fernandi v. Strully*, 35 *N.J.* 434, 173 *A.*2d 277 (1961), and later elucidated in *Lopez v. Swyer*, 62 *N.J.* 267, 300 *A.*2d 563 (1973), it seemed rather straightforward. Decades later, lawyers and judges are still grappling with the application of this principle of simple justice to the myriad of circumstances that arise in everyday life. This is another such instance.

*II*

Plaintiff Olga Martinez is the mother of three children, two of whom were fathered by Carl Farrish, a forklift driver. On April

3, 1993, Farrish was badly beaten in a street brawl and was admitted to defendant Cooper Hospital. On April 4, a CT scan of his abdomen disclosed intestinal tract inflammation (edema) and accumulating fluid. The doctor recommended a follow-up CT scan because the first was opaque with respect to the intestinal tract; however, no follow-up scan was conducted until April 6. The second CT scan revealed a large amount of intraperitoneal fluid, as well as free peritoneal air. The doctor noted that a perforated viscus was a strong possibility. That day, surgeons operated and found a small bowel perforation and three liters of peritoneal fluid within the abdominal cavity. The fluid was removed and the perforation repaired, but Farrish died on April 8, 1993. The death certificate, reflecting an autopsy report, noted that the immediate cause of death was peritonitis due to perforation of the small intestine; that the "injury" was caused by a beating; and that Farrish's death was due to a "homicide."

Ms. Martinez, who was married to someone else at the time of Farrish's death, first learned that Farrish was in the hospital on April 5 when his then fiancee called to tell her about the beating. On April 8, Ms. Martinez was able to take the children to see their father. Five minutes after they arrived at the hospital, the doctor told them that while the hospital staff "did all they could," Farrish had just died due to a small hole in his intestines.

According to Ms. Martinez, the doctor's explanation about the cause of death, a hole in the intestines, meant nothing to her. When she finally saw Farrish, he looked like a "monster" because his face and arms were swollen. She believed that his condition was the result of the severe beating combined with the fluids that the doctors had administered. Ms. Martinez attended the funeral with her children but did not speak to any family members about the cause of Farrish's death.

Ms. Martinez always believed that the death was a homicide. She relied on the doctor's assurance that he did all that he could, on the death certificate and autopsy that concluded that the death was due to homicide, and on a newspaper article that stated

Farrish had died of the injuries sustained in the fight. She never inquired further into the circumstances surrounding his death because she never suspected medical negligence.

In July 1993, Ms. Martinez moved to Puerto Rico with her children. On April 24, 1996, she received a letter from her present counsel, John Eichmann. Eichmann informed her that evidence had been brought to his attention that revealed that Farrish's death may have been the result of negligence. Eichmann also stated that, "[i]f his death was the result of the malpractice of the hospital, there could be a substantial sum of money due to his two children as his natural survivors."

The evidence to which Eichmann referred was an anonymous letter, postmarked October 12, 1995, received by Farrish's fiancee, that stated:

I am writing you about something that has been bothering me for a long time. I should have written two years ago.

On April 3, 1993, I was working the overnight shift at Cooper Hosp. and witnessed something that was wrong and I believe contributed to the death of a man named Carl Farrish.

At about 12:30 am I noticed a tall black cop about 50 years old sitting with another stocky black man who appeared to be in great pain and holding his belly. Over the next 6 hours the injured man moaned constantly, also twice he vomited blood. The cop told the ER nurse, but the man still wasn't seen by a doctor for at least five or six hours more. I believe this delay contributed to the man's death. I feel the hospital was very negligent in their lack of concern for the obviously injured man. I'm sorry for your loss and wish you good luck.

Farrish's fiancee and his mother already harbored suspicions surrounding his death. Because Farrish was a healthy man, they thought it odd that he suddenly developed all of these serious problems, even after sustaining the beating. However, they never discussed this with Ms. Martinez or with anyone at the hospital. For Ms. Martinez, the letter was the first indication that negligence may have played a part in Farrish's death.

As a result, she filed a malpractice action against Cooper Hospital, several physicians and John Doe defendants on January 17, 1997, over three and one-half-years after Farrish died, but within two years of receiving the letter. Cooper Hospital filed an

answer asserting the statute of limitations as an affirmative defense. The trial court denied the Hospital's motion for summary judgment. The Hospital appealed, and the Appellate Division reversed and remanded for a *Lopez* hearing to determine if the discovery rule applied.[1]

A hearing was held at which the previously described facts were established. Thereafter, the trial judge dismissed Ms. Martinez' complaint with prejudice, concluding that because all of the facts that suggested negligence were present on the day that Farrish died, the statute of limitations began to run at the time of his death, or a few days later. Ms. Martinez appealed.

In an unpublished opinion, the Appellate Division affirmed. Applying the *Lopez* standard of a "reasonable person exercising ordinary diligence and intelligence," the court concluded that because Farrish was a healthy man who died of peritonitis due to a perforated viscus, a reasonable person would have reviewed the medical records and determined that the delay by hospital personnel was a major factor in his death. We granted certification on May 12, 1999. 160 *N.J.* 476, 734 *A.2d* 791. We now reverse.

### III

The statute of limitations governs the period during which a party may bring a suit, and generally accrues from the date of the negligent act or omission. *Tortorello v. Reinfeld*, 6 *N.J.* 58, 65, 77 *A.2d* 240 (1950). The purpose of a limitations period, which embodies important public policy considerations, is to stimulate activity, punish negligence, and "promote repose by giving security and stability to human affairs." *Wood v. Carpenter*, 101 *U.S.* 135, 139, 25 *L.Ed.* 807 (1879). *See Union City Hous. Auth. v. Commonwealth Trust Co.*, 25 *N.J.* 330, 335, 136 *A.2d* 401 (1957) (noting that primary purpose of statutes of limitations is to create repose, to eliminate stale claims, and to compel exercise of

---

[1] *Lopez, supra,* 62 *N.J.* at 275–76, 300 *A.2d* 563.

right of action so that opposing party has fair opportunity to defend).

For medical malpractice actions, the suit must be commenced within two years of the alleged negligence. *N.J.S.A.* 2A:14–2. To prevent the sometimes harsh result of a mechanical application of the statute of limitations, we adopted the discovery rule. *Vispisiano v. Ashland Chem. Co.*, 107 *N.J.* 416, 426, 527 *A.*2d 66 (1987); *Fernandi v. Strully*, 35 *N.J.* 434, 449–50, 173 *A.*2d 277 (1961). The discovery rule is essentially a rule of equity. *Lopez, supra,* 62 *N.J.* at 273, 300 *A.*2d 563. It "provides that in an appropriate case a cause of action will be held not to accrue until the injured party discovers, or by an exercise of reasonable diligence and intelligence should have discovered that he may have a basis for an actionable claim." *Id.* at 272, 300 *A.*2d 563.

In *Baird v. American Med. Optics,* 155 *N.J.* 54, 66, 713 *A.*2d 1019 (1998), we said:

Critical to the running of the statute is the injured party's awareness of the injury and the fault of another. The discovery rule prevents the statute of limitations from running when injured parties reasonably are unaware that they have been injured, or, although aware of an injury, do not know that the injury is attributable to the fault of another. (Citations omitted.)

The question is whether the facts presented would alert a reasonable person exercising ordinary diligence that he or she was injured due to the fault of another. The standard is basically an objective one—whether plaintiff "knew or should have known" of sufficient facts to start the statute of limitations running. *Id.* at 72, 713 *A.*2d 1019.

That does not mean that a plaintiff must have knowledge of a specific basis for legal liability or a provable cause of action before the statute of limitations begins to run. *Savage v. Old Bridge–Sayreville Med. Group,* 134 *N.J.* 241, 248, 633 *A.*2d 514 (1993). It does, however, require knowledge not only of the injury but also that another is at fault. *Id.* at 246, 633 *A.*2d 514; *Lynch v. Rubacky,* 85 *N.J.* 65, 70, 424 *A.*2d 1169 (1981). Both are critical elements in determining whether the discovery rule applies.

For that analysis, plaintiffs are divided into two classes: those who do not know that they have been injured and those who know they have suffered an injury but do not know that it is attributable to the fault of another. *Lopez, supra,* 62 *N.J.* at 274, 300 *A.*2d 563. A cause of action does not accrue until both of those factors exist.

In many cases, knowledge of fault is acquired simultaneously with knowledge of injury. Fault is apparent, for example, where the wrong tooth is extracted during surgery, *Tramutola v. Bortone,* 118 *N.J.Super.* 503, 512–13, 288 *A.*2d 863 (App.Div.1972), or a foreign object has been left within the body after an operation. *See Fernandi, supra,* 35 *N.J.* at 452, 173 *A.*2d 277. In other cases, however, a plaintiff may be aware of an injury, but not aware that the injury is attributable to the fault of another.

In *Lopez, supra,* the plaintiff suffered from severe burns, pain, and nausea after undergoing radiation therapy following a radical mastectomy for breast cancer. Plaintiff's husband had previously been told by a physician that "this was not malpractice. This sometimes happens." *Lopez v. Swyer,* 115 *N.J.Super.* 237, 244, 279 *A.*2d 116 (App.Div.1971). While Ms. Lopez was being treated for her symptoms by another doctor, she overheard him say to colleagues, "[a]nd there you see, gentlemen, what happens when the radiologist puts a patient on the table and goes out and has a cup of coffee." *Lopez, supra,* 62 *N.J.* at 271, 300 *A.*2d 563. The Appellate Division reversed the trial court's grant of summary judgment to the radiologist, and we affirmed. Although Ms. Lopez knew that her burns were caused by the radiation therapy, the record did not reveal that she knew or should have known, prior to overhearing the "cup of coffee" statement, of the causal connection between her physician's negligent treatment and her injury.

Likewise, in *Lynch, supra,* 85 *N.J.* at 67–68, 424 *A.*2d 1169, plaintiff injured her ankle and was operated on by defendant. When she did not improve and suffered great pain and disability, the defendant continually assured her that her condition was due

to the original injury and the healing process. It was not until after the statute of limitations expired that another physician suggested that plaintiff's problem was due to defendant's negligence. *Id.* at 69, 424 *A.*2d 1169. We held that "all of the factors militating against adequate knowledge of physician fault" were present in the case. *Id.* at 77, 424 *A.*2d 1169. Included were plaintiff's faith in defendant, his reassurances that the pain and swelling were part of the healing process, and the fact that a physician whom plaintiff later consulted did not suggest defendant's medical negligence until after the statute had run. We held her action to be timely.

A sub-category of the "knowledge of fault" cases is that in which a plaintiff knows she has been injured and knows the injury was the fault of another, but does not know that a third party was also responsible for her plight. *Savage, supra,* 134 *N.J.* at 243, 633 *A.*2d 514, is a good example of this. In *Savage,* plaintiff filed a medical malpractice action against physicians who had administered a tetracycline derivative to her in early childhood that discolored her teeth. Plaintiff became 21 in 1981. Up to that point the statute was tolled by reason of her age. She filed her complaint in 1989 alleging she was unaware until 1988 that her injury was due to the fault of the doctors. The trial judge ruled that because she had all the "facts" at the time she reached majority (*i.e.* that her teeth were discolored and that medication given to her as a child might have caused the discoloration), she had only two years to bring suit. The Appellate Division disagreed. 260 *N.J.Super.* 417, 616 *A.*2d 1307 (1992). It reasoned that, although plaintiff was aware that she had suffered injury and that medication was a likely cause of the injury, the record did not reveal that she was or should have been aware that a lack of care in administering the medication was also a cause of her condition. *Id.* at 421–22, 616 *A.*2d 1307.

We agreed with the Appellate Division's characterization of *Savage* as a case like *Lopez* where, although plaintiff was aware of her injury and that the medicine was a likely culprit, she was not

aware that her injury also was due to her physicians' avoidable fault. *Savage, supra,* 134 *N.J.* at 247, 633 *A.*2d 514. In so ruling, we distinguished Savage's claims from those of the plaintiff in *Apgar v. Lederle Labs.,* 123 *N.J.* 450, 453, 588 *A.*2d 380 (1991), whose suit against the manufacturer we held time barred because plaintiff knew, by the time she was 18 years old, that the medicine she had taken as a child had discolored her teeth; that that medicine "had not been thoroughly tested"; and that "certain things weren't right." See also *Gallagher v. Burdette–Tomlin Med. Hosp.,* 163 *N.J.* 38, 42, 747 *A.*2d 262 (2000), also decided today, that held that plaintiff could invoke discovery rule, long after she sued her surgeon for malpractice, where she first discovered her after-care physicians were also at fault because of the surgeon's expert's deposition testimony. The basic principle of *Lopez, Lynch, Savage* and *Gallagher* is that where, within the limitations period, a plaintiff knows of an injury and that the injury is due to the fault of another, he or she has a duty to act. However, those cases also stand for the proposition that where a plaintiff knows of an injury, but fault is not self-evident or implicit in the injury itself, it must be shown that a reasonable person would have been aware of such fault in order to bar the plaintiff from invoking the discovery rule.

Finally, we note that a plaintiff's subjective characteristics, standing alone, will not absolve him or her of the obligation to file a claim within the relevant statutory period. Thus, a litigant generally will not succeed under discovery rule analysis by claiming illiteracy or lack of education as the basis for having failed to appreciate either the existence of an injury or the fault of another. However, a litigant's personal characteristics may be relevant to an objective fact in issue. For example, if a defendant took advantage of a plaintiff's illiteracy or lack of education in such a way as to prevent a timely filing, that happenstance could constitute a valid consideration in a discovery rule proceeding. That is the objective use of subjective information to which we alluded in *Baird, supra.*

## IV

It is against this backdrop that these parties' claims should be viewed. Ms. Martinez contends that the trial and appellate courts erred in barring her complaint because her actions were entirely reasonable under the circumstances; she had no warrant to suspect medical malpractice or even to look at the hospital records; and that, in any event, her illiteracy, lack of education and language barriers needed to be factored into the reasonable person analysis.

Defendant counters that Ms. Martinez did not exercise reasonable diligence in investigating Farrish's death; that all of the factors suggesting negligence were available to Ms. Martinez within time; that the letter from Mr. Eichmann did not reveal new "facts"; and that the standard to be applied is an objective one, not dependent on the idiosyncracies of an individual plaintiff.

We agree with the trial court and the Appellate Division that the applicable standard is an objective one: what a reasonable person knew or should have known from the surrounding facts. *Baird, supra,* 155 *N.J.* at 72, 713 *A.*2d 1019. It is in the application of that standard that we part company from them.

The Appellate Division concluded that Ms. Martinez had the capacity to check the hospital records; had she done so, it would have been clear that the delay in obtaining the CT scan contributed to Farrish's death. According to the Appellate Division, Ms. Martinez' failure to obtain and review the records was unreasonable.

We disagree, and not because Ms. Martinez is, in her own words, an "illiterate Puerto Rican woman with little education, no medical experience and language difficulties." A discovery rule analysis does not rise or fall on the personal characteristics of plaintiffs, but on the circumstances in which they find themselves and their responses to those circumstances. Tested against that standard, we view Ms. Martinez' conduct as commensurate with that of the proverbial reasonable person.

The injury in this case was apparent: Farrish was beaten and died. Ms. Martinez believed from the outset that it was the fault of another—the perpetrator of the crime against Farrish. She was not present at the hospital when Farrish was brought in, and she did not know that he vomited blood and waited for many hours before he was seen. The death certificate, reflecting an autopsy, and a newspaper article both pointed her to the conclusion that Farrish's death was a homicide. Ms. Martinez had no reason to suspect malpractice.

That is especially so in light of the physician's statement to her that "they did all they could." His assurances, which would tend to deflect an ordinary person's attention from the hospital's conduct, may be compared to the defendant's conduct in *Abboud v. Viscomi*, 111 *N.J.* 56, 65, 543 *A.*2d 29 (1988) (noting that dentist's repeated assurances that plaintiff's post-extraction pain was normal contributed to delay in discovering permanent nerve damage), and *Lynch, supra,* 85 *N.J.* at 74–76, 424 *A.*2d 1169 (observing that doctor's repeated assurances that plaintiff's condition was result of normal "healing process" impeded plaintiff from discovering doctor's fault). Although decedent's fiancee and mother said, with the benefit of hindsight, that they both thought there may have been negligence, they had no specific basis for that conclusion and did not share those thoughts with Ms. Martinez.

Although Ms. Martinez could have read the 300 pages of medical reports, she had no reason to do so. To her, the hospital was engaged in repairing the injuries Farrish sustained at the hands of his assailant. He was beaten badly enough to require hospitalization and surgery; he did not improve after the beating. The direct correlation between the beating and Farrish's ultimate death, confirmed by the medical examiner and reported by the newspaper, is crucial here because a reasonable person would have no reason to believe that a hospital that was engaged to aid Farrish was actually at fault. There was simply no cause for Ms. Martinez to attribute Farrish's death to anything other than the beating he suffered.

It is not necessary every time a person dies in a hospital for his or her relatives to immediately suspect malpractice. People die in hospitals in the absence of wrongdoing (for example, those gravely injured in accidents and the infirm elderly). Many times complications arise even if a procedure is performed perfectly. Medicine is not an exact science. *Newmark v. Gimbel's, Inc.*, 54 *N.J.* 585, 596–97, 258 *A.*2d 697 (1969). The rule accepted by the lower courts, that Ms. Martinez was unreasonable because she did not obtain and analyze Farrish's medical records even though she was *not suspicious, encourages mistrust and essentially pits patients against their physicians even in cases where there is not even a trace of negligence apparent.

This is not a case in which a perfectly healthy individual underwent elective surgery and died. Obviously some inquiry would be required by a reasonable person in such circumstances. On the contrary, this case involves Farrish's severe beating; a physician's assurance that everything was done properly; and official recognition of Farrish's death as a homicide in the death certificate.

## V

We are satisfied that under presently existing standards governing the discovery rule, Ms. Martinez acted in an objectively reasonable way in connection with Farrish's death. She believed the official version of events and had no duty to investigate further. This decision is not based on any personal deficiencies or idiosyncracies of Ms. Martinez. It is based upon our assessment of the facts surrounding Farrish's death and our conclusion that Ms. Martinez acted in an entirely reasonable manner. She did not delay but took timely action as soon as she received the information in the anonymous letter. No issue of prejudice to the Hospital was raised in this appeal. The judgment of the Appellate Division is reversed. The matter is remanded to the Law Division for proceedings consistent with this opinion.

*For reversal and remandment*—Chief Justice PORITZ and Justices O'HERN, GARIBALDI, STEIN, COLEMAN, LONG and VERNIERO—7

*Opposed*—None.