**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1109-24

JACQUELINE GALAYDA,

     Plaintiff-Respondent,

and

MARK GALAYDA,

     Plaintiff,

v.

IMANI JACKSON ROSARIO, M.D.
and UNIVERSITY UROLOGY
ASSOCIATES OF NEW JERSEY,

     Defendants-Appellants/
     Cross-Respondents,

and

TROY SUKKARIEH, M.D. and
ALEXANDER KIRSHENBAUM,
M.D.,

     Defendants-Respondents/
     Cross-Appellants,

and

NEW JERSEY UROLOGY,

    Defendant-Respondent.

_____

Argued May 15, 2025 — Decided May 27, 2025

Before Judges Mawla, Natali, and Walcott-Henderson.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Monmouth County, Docket No. L-3622-20.

Brion D. McGlinn argued the cause for appellants Imani Jackson Rosario, M.D. and University Urology Associates of New Jersey (Ruprecht Hart Ricciardulli & Sherman, LLP, attorneys; Michael R. Ricciardulli, of counsel and on the briefs; Brion D. McGlinn, on the briefs).

Russell L. Malta argued the cause for appellants Troy Sukkarieh, M.D. and Alexander Kirshenbaum, M.D. (Orlovsky Moody Schaaff Conlon Bedell McGann & Gabrysiak, attorneys; Russell L. Malta, of counsel and on the brief; Erin A. Bedell, on the brief).

Jeffrey E. Strauss argued the cause for respondent Jacqueline Galayda (Strauss Law Offices, attorneys; Jeffrey E. Strauss, of counsel and on the brief).

PER CURIAM

This appeal involves the application of the discovery rule to a claim of medical malpractice that would otherwise be barred by the statute of limitations. On leave granted, Dr. Imani Jackson Rosario, University Urology Associates of

New Jersey (University Urology), and Drs. Troy Sukkarieh and Alexander Kirshenbaum (collectively "defendants") appeal from an October 22, 2024 order denying their motion for summary judgment, arguing plaintiff Jacqueline Galayda's complaint was untimely and the court erred by misapplying the discovery rule. After careful review of the record and application of the governing legal principles, we affirm.

I.

On September 15, 2016, plaintiff began treatment with defendant Dr. Rosario, a urologist. Medical notes from that appointment show plaintiff was experiencing "bright red urine, urgency, frequency, nocturia, flank pain, and abdominal pain."

Dr. Rosario requested a computed tomography (CT) scan to rule out kidney stones and renal masses and scheduled a cystoscopy. According to plaintiff, Dr. Rosario diagnosed her with a blockage in her ureter and eventually inserted ureter stents, which had to be replaced several times. Dr. Rosario never diagnosed plaintiff with a bladder issue. In January 2018, plaintiff began treatment with Drs. Sukkarieh and Kirshenbaum for the same condition.[1] Dr.

---

[1] Drs. Kirshenbaum and Sukkarieh are members of the Central Jersey Urology Associates medical practice.

A-1109-24

Kirshenbaum changed her ureter stents.

On August 30, 2018, plaintiff went to the emergency room at Jersey Shore Medical Center complaining of kidney pain. She was examined by Dr. John Chapman, the on-call urologist, who diagnosed her with kidney failure. Dr. Chapman's notes from plaintiff's hospital stay reflect that he had "discussed . . . options with [plaintiff] as well as with Dr. [Avais] Masud of nephrology" and explained it was possible plaintiff was suffering from a neurogenic bladder "and that perhaps the ureter stents are not benefiting her in any fashion." That same day, plaintiff also consulted with Dr. Masud. Following her hospital stay and on Dr. Chapman's advice, plaintiff returned to her urologist, Dr. Sukkarieh.

Plaintiff was next treated by Drs. Kirshenbaum and Sukkarieh on September 11, September 21, and October 12, 2018. On September 11, Dr. Kirshenbaum diagnosed plaintiff with hydronephrosis and end-stage renal disease, and the office notes stated "[w]e will discuss with her nephrologist the possibility of coming off dialysis. If so, [she] may benefit from ureteral reimplantation." By September 21, 2018, Dr. Sukkarieh noted plaintiff "[n]ow has bilateral nephrostomies[ and w]ants to have bilateral ureteral reimplants," but her creatinine had worsened. Dr. Sukkarieh recommended plaintiff "[k]eep nephrostomies for now," and acknowledged plaintiff "[w]ants to proceed with

4

robotic assisted laparoscopic bilateral ureteral reimplants."  Dr. Sukkarieh's notes from plaintiff's October 12 appointment also include a diagnosis of "[h]ydronephrosis with ureteral stricture" and maintained the same recommendation as noted at her September 21 appointment.

On October 12, 2018, plaintiff sought a second opinion from Dr. Sammy Elsamra of Robert Wood Johnson Urology Department regarding Dr. Sukkarieh's recommended treatment of bilateral robotic ureteral reimplants. There is no dispute that by this time, plaintiff was in renal failure and on dialysis. Dr. Elsamra discussed the likely diagnosis of neurogenic bladder with her. According to plaintiff, she informed Dr. Elsamra that his diagnosis was different from that of Dr. Sukkarieh.  Dr. Elsamra's appointment notes from October 12, 2018 include a diagnosis of "bilateral hydronephrosis due to neurogenic bladder, unclear if there is ureteral stricture."  He recommended scheduling a cystoscopy, "bilateral retrograde pyelogram and bilateral antegrade nephrostograms to evaluate for possible ureteral stricture."

On October 29, 2018, Dr. Elsamra performed the cystoscopy, pyelogram, nephrostogram, and nephrostomy tube exchange procedures.  The post-surgical medical report included a diagnosis of "bilateral hydronephrosis likely due to bilateral ureteral stricture likely due to neurogenic bladder."  On November 7,

5

2018, at her post-surgical appointment, Dr. Elsamra, advised plaintiff "the ureters were opened [during the surgery] and that [she] never should have had stents and that the problem was really just the bladder being a neurogenic bladder."

Approximately two years later, on October 30, 2020, plaintiff filed a complaint against defendants, alleging medical malpractice and negligence for "failing to perform and/or order testing to diagnose [her] actual problems prior to October 29, 2018, fail[ing] to take actions that would have prevented [her from] sustaining a neurogenic bladder, and fail[ing] to identify the cause of [her] symptoms as they worsened despite treatment." Plaintiff further alleged, as a result of this negligence, she suffered "severe injuries, pain and suffering, disability, impairment, loss of enjoyment to life, and . . . economic damages including but not limited to medical bills and expenses, and loss of income for the rest of [her] life."

Dr. Rosario and University Urology moved for summary judgment. On May 16, 2022, the motion court denied defendants' summary judgment motion without prejudice and ordered a Lopez[2] hearing to consider the timeliness of plaintiff's complaint under the discovery rule.

---

[2] Lopez v. Swyer, 62 N.J. 267 (1973).

A-1109-24

The Lopez hearing commenced on January 31, 2023. Both plaintiff and her husband testified. Plaintiff acknowledged she had several medical procedures in which stents were inserted into her ureters and replaced several times from 2016 to 2018. She testified Dr. Rosario was the first to insert the ureter stents and had also replaced those stents several times and yet, her symptoms were not improving, and she "was still having the issues with the incontinence and . . . pain."

Plaintiff further testified she next treated with Dr. Kirshenbaum beginning in January 2018. Dr. Kirshenbaum changed the stents and advised that possible reimplantation of the stents was an option, but she also advised plaintiff to wait and see how things went. According to plaintiff, neither Drs. Rosario, Sukkarieh, nor Kirshenbaum ever diagnosed her with a bladder issue.

Plaintiff testified she first heard the term neurogenic bladder from Drs. Chapman and Masud while a patient at Jersey Shore Medical Center, but Dr. Chapman "said it could be a possibility. He wasn't sure. He wouldn't know unless [she] had . . . test[ing] done." Plaintiff denied being advised of or understanding that anybody had done anything wrong at that time. She testified, Dr. Chapman "was trying to give [her] his best ideas of what it could be, that there were other things that . . . could possibly be doing this to [her]." According

7

to plaintiff, Dr. Masud advised her the stents "might not be benefiting [her] and that he couldn't be sure."

Plaintiff also testified about her appointment with Dr. Sukkarieh, who recommended reimplantation surgery, which prompted her to seek a second opinion. Plaintiff stated she consulted with Dr. Elsamra, who recommended a cystoscopy to determine the nature of her condition and whether reimplantation would work. She underwent the cystoscopy procedure and had her post-operative appointment with Dr. Elsamra on November 7, where he advised it was her bladder causing her symptoms, not her kidneys, and there was no visible blockage in either of her ureters.

Following the Lopez hearing, the court issued a thorough written decision and order denying Dr. Rosario and University Urology's motion for summary judgment.[3] The court relied on plaintiff's testimony "that she always believed and was told that the problem was with her urethra" as she had seen multiple "doctors who all replaced her ureters with stents," and when "she saw Dr. Elsamra in [October 2018,] she didn't know what her condition was because the

---

[3] The court's October 22, 2024 order confirms its determination of Dr. Rosario and University Urology's initial summary judgment motion. Although the record does not show any additional motion having been filed by Drs. Kirshenbaum and Sukkarieh, they nevertheless join on appeal.

doctors didn't know what her condition was."

The court reasoned "[t]he facts are quite clear that [plaintiff] was first advised that there was fault of her prior physicians in ignoring and not addressing her neurogenic bladder, at the . . . post-operative office visit with Dr. Elsamra on November 7, 2018." And, while plaintiff learned she was in renal failure from Dr. Chapman, "she did not know or have reasonable belief that this was due to the fault of prior doctors as it was all still a process of trying to figure out what was going on and how best to treat the situation." Further, Dr. Chapman did not communicate "fault."

The court explained, "it is clear from the medical documentation submitted that the doctors who treated her were not sure of the diagnosis of neurogenic bladder . . . until [plaintiff] underwent a number of procedures including a cystoscopy on October 29, 2018[,] that confirmed the diagnosis." The court found plaintiff pursued her claim in a reasonable time and within two years of the date she discovered that her kidney failure may have been caused by a neurogenic bladder rather than blocked ureters, and denied defendants' motion.

II.

9

Our review of a ruling on summary judgment is de novo, applying the same legal standard as the trial court. Townsend v. Pierre, 221 N.J. 36, 59 (2015). We "review the competent evidential materials submitted by the parties to identify whether there are genuine issues of material fact and, if not, whether the moving party is entitled to summary judgment as a matter of law." Bhagat v. Bhagat, 217 N.J. 22, 38 (2014) (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)); R. 4:46-2(c).

Under N.J.S.A. 2A:14-2(a), medical malpractice actions must be initiated within two years of the alleged negligent act. "[T]he purpose of statutes of limitations is to stimulate litigants to pursue their causes of action diligently and to 'spare the courts from litigation of stale claims.'" Vispisiano v. Ashland Chem. Co., 107 N.J. 416, 426 (1987) (quoting Farrell v. Votator Div. of Chemetron Corp., 61 N.J. 111, 115 (1973)). The statute of limitations does not run until the injured party is both aware of the injury and that someone else is at fault, and the plaintiff need not have knowledge of the legal basis of his or her claim. Martinez v. Cooper Hosp.-Univ. Med. Ctr., 163 N.J. 45, 53 (2000). However, to avoid a rigid or mechanical application of the statute of limitations, courts apply the discovery rule, which "is essentially a rule of equity." Id. at 52 (citing Lopez, 62 N.J. at 273).

A-1109-24

"The discovery rule prevents the statute of limitations from running when injured parties reasonably are unaware that they have been injured, or, although aware of an injury do not know that the injury is attributable to the fault of another." Ibid. (quoting Baird v. Am. Med. Optics, 155 N.J. 54, 66 (1998)); see also Savage v. Old Bridge-Sayreville Med. Grp., P.A., 134 N.J. 241, 248 (1993) (providing discovery will be imputed when an injury has occurred and there exists the awareness of "facts that would alert a reasonable person exercising ordinary diligence that a third party's conduct may have caused or contributed to the cause of the injury and that conduct itself might possibly have been unreasonable or lacking in due care") (emphasis omitted). The court "impute[s] discovery if the plaintiff is aware of facts that would alert a reasonable person to the possibility of an actionable claim; medical or legal certainty is not required." Lapka v. Porter Hayden Co., 162 N.J. 545, 555-56 (2000).

Whether the party was aware of the injury and who caused it is an objective standard. Martinez, 163 N.J. at 52. A plaintiff seeking to apply the discovery rule bears the burden of showing that a reasonable person in his or her position would not have discovered the injury. Kendall v. Hoffman-La Roche, Inc., 209 N.J. 173, 194 (2012). Knowledge of injury and fault can occur simultaneously or may occur apart from one another, but the plaintiff must have

knowledge of both for the statute of limitations to begin to run.  Martinez, 163 N.J. at 53.  "Knowledge of injury plus knowledge of cause" does not equal "knowledge of fault."  Savage, 134 N.J. at 249.  Further, knowledge of fault for the purposes of the discovery rule "requires only the awareness of facts that would alert a reasonable person exercising ordinary diligence that a third party's conduct may have caused or contributed to the cause of the injury and that conduct itself might possibly have been unreasonable or lacking in due care."  Id. at 248 (emphasis in original).  "[T]he cause of action does not accrue until the discovery of the injury or facts suggesting the fault of another person."  Id. at 247 (quoting Tevis v. Tevis, 79 N.J. 422, 432 (1979) (emphasis omitted)).

In Martinez, the ex-wife of a decedent filed a medical malpractice action against the hospital where decedent, Carl Farrish, had been treated for injuries he sustained as a result of a brutal assault.  163 N.J. at 49.  Her complaint was filed more than three-and-a-half years after Farrish's death when plaintiff received an anonymous letter from a member of the hospital's medical staff who claimed to have observed Farrish waiting approximately six hours for treatment.  Ibid.  The Court reasoned the death certificate and a newspaper article detailing the incident characterized the death as a homicide and plaintiff had no reason to suspect malpractice on behalf of the hospital at the time, and the Court applied

the discovery rule to toll the statute of limitations and permit plaintiff's complaint well over two years from decedent's death.  Id. at 56-57.  The Court found plaintiff "acted in an objectively reasonable way in connection with Farrish's death."  Id. at 58.

### III.

Before us, defendants contend the court incorrectly determined when plaintiff had notice of an actionable claim under the discovery rule.  More particularly, they maintain plaintiff "was on notice of her cause of action against Dr. Rosario no later than August 30, 2018, when she consulted with Dr. Chapman."  And, "[a]ny reasonable person, already having been told that the stents were not providing a benefit to her condition, would only have further reason to know of the possibility of wrongdoing when a subsequent physician then reversed the treatment provided by the defendants."

Defendants further contend the court misapplied the discovery rule because the "limitations period must begin to run when a plaintiff is aware of facts sufficient to alert a reasonable person to the 'possibility of wrongdoing.'"  Savage, 134 N.J. at 248.  They assert plaintiff was sufficiently aware of her injury in August 2018 for a reasonable person to be on notice of "the possibility of an actionable claim."

Drs. Sukkarieh and Kirshenbaum raise the same arguments in their appeal, contending "[d]efinite certainty as to the existence of a cause of action has never been held to be a requirement or the appropriate standard for accrual under the discovery rule" and plaintiff "admits that Dr. Chapman explained to her that she had a high pressure, neurogenic bladder condition that was causing urine to reflux up into her kidneys, thereby destroying them."

Applying the requisite de novo review, we reject defendants' arguments plaintiff was on notice of her claim against defendants as of August or October 2018. The motion court properly denied the summary judgment motion.

We next review Dr. Chapman's notes regarding his treatment of plaintiff, which defendants emphasize supports their contentions. The notes, in pertinent part state:

> I discussed the options with [plaintiff] as well as with Dr. Masud of nephrology. I explained that it is possible [plaintiff] could have a neurogenic bladder that is storing at high pressures and causing severe reflux, and that perhaps the ureter stents are not benefiting her in any fashion. I explained that placing a Foley catheter in the bladder might decompress the bladder and thus drain the kidneys just as effectively as the nephrostomy tubes. However, I explained further that it would be a trial and error to do that first and then to delay placing nephrostomy tubes. Additionally[,] without having definitive information to confirm that there was not obstruction, ultimately Dr. Masud and [plaintiff] and I all collectively agreed that proceeding with the

14

nephrostomy tubes to be certain the kidneys are adequately drained would be the best step due to the fact that she is essentially in renal failure at this point and dialysis is an impending concern.

[(Emphasis added).]

Defendants maintain as of this visit plaintiff knew her condition was deteriorating and the ureter stents were not benefiting her in any way, thus, a reasonable person in plaintiff's position would have known the existence of an injury and attributed fault to defendants as of August or October 2018. They also maintain medical certainty is not required, and the court erred in tolling the statute of limitations until the November 7 date, which would render her complaint timely under the discovery rule.

Plaintiff admitted during the Lopez hearing, in her August 2018 consultation with Dr. Chapman "it was also mentioned that perhaps . . . I could have a bladder issue as well as blocked ureters on top of the renal failure." According to plaintiff, this was the first time a doctor had mentioned the possibility of a "neurogenic bladder," as well as the possibility her symptoms stemmed from a bladder issue at all, and she understood "it was a possibility. It wasn't anything definite[;] that [she] needed more tests."

While plaintiff does not dispute Dr. Chapman's statements "it was possible [she] was suffering from a neurogenic bladder" and perhaps the ureteral stents

15

were not benefitting her, there is no support for defendants' contention Dr. Chapman conveyed there was any problem with the care provided by her treating doctors, or that a reasonable person in plaintiff's shoes should have known defendants were at fault for failing to properly diagnose and treat her bladder condition.  Indeed, as of October 2018, plaintiff knew her bladder was blocked causing a deterioration in her kidney function and knew the stents Dr. Rosario placed into her ureters were not working.  However, there was no suggestion of fault on the part of any of her medical providers.

Dr. Chapman's hospital notes do not support defendants' contentions. Instead, they show plaintiff was informed only that it was possible she was suffering from a neurogenic bladder and perhaps the ureter stents were not benefiting her in any fashion.  Moreover, according to plaintiff, after conveying this information to her, Dr. Chapman recommended that she return to her treating doctor for a follow-up.  Such a recommendation is hardly indicative of the fact Dr. Chapman was attributing fault to plaintiff's medical providers, or that a reasonable person in plaintiff's position would have understood that her treating doctors were at fault for failing to properly diagnose and treat her medical condition.

We are satisfied plaintiff acted with reasonable diligence in asserting her

16

medical malpractice claims within two years of learning that she had a neurogenic bladder condition instead of a blocked ureter problem, which occurred at her post-surgical visit with Dr. Elsamra. Prior to November 7, 2018, plaintiff had no basis to conclude that she had been misdiagnosed, or that her treating doctors were at fault.

Moreover, we note although plaintiff knew her kidney condition had deteriorated and her kidneys were failing as of her emergency room visit with Dr. Chapman, defendants continued to recommend stent reimplantation, suggesting that her complex medical issue remained with her ureters. Indeed, prior to the August consultation with Dr. Chapman, plaintiff had been consistently treated for the same kidney condition by several different doctors, thereby suggesting she may not have been responding to the treatments, and not that she had been misdiagnosed. As plaintiff argues, "[w]hat was unknown to her, until she was told by Dr. Elsamra, after the diagnostic operation, is that the care provided by Drs. Rosario, . . . Kirshenbaum[,] and . . . Sukkarieh was not only unnecessary but misguided[,] and . . . ignore[ed] the developing bladder condition that caused the damage to her kidneys."

We further reject defendants' contention we are bound by the court's factual findings plaintiff had knowledge of her neurogenic bladder condition as

A-1109-24

early as her August 2018 hospital consultation with Dr. Chapman. Dr. Chapman's own hospital notes provide insight into his impressions and discussions with plaintiff, which do not support the court's finding plaintiff had "knowledge of her neurogenic bladder." In fact, Dr. Chapman diagnosed her with kidney failure and explained it was possible plaintiff was suffering from a neurogenic bladder. We need not rely on this finding, particularly given our de novo standard of review.

Rather, as the record shows, it was not until November 7, 2018 that plaintiff learned from Dr. Elsamra that her ureters were not blocked, she should never have had ureteral stents, and was diagnosed with a neurogenic bladder. Accordingly, plaintiff did not know and could not have known defendants had failed to diagnose and treat her neurogenic bladder until that date. Thus, the statute of limitations did not begin to run until that date. Under the discovery rule, the issue is whether a reasonable person in plaintiff's position would be on notice she had a cause of action against defendants—whether she knew of the injury and had reason to believe defendants were at fault. Martinez, 163 N.J. at 52.

Applying this standard, we conclude plaintiff acted with reasonable diligence in filing her malpractice action within two years of learning of the

potential fault of her prior treating physicians. Because plaintiff filed her complaint within two years of the November 7, 2018 date, her complaint is timely under the discovery rule.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division